as was most advantageous to it. "A debtor paying money to a creditor to whom he owes several debts may direct the application of the payment, because the money is his, and he may do as he will with it, and control its application. But the debtor must exercise his option as to the application when he makes the payment. After that the money has ceased to be his, and is no longer subject to his control. Then it belongs to the creditor, and he is master of it, and may control its application." Bank v. Webb, 94 N. Y. 467. "The mere fact that there is a surety for one of the debts does not preclude the creditor from applying a payment so received to the debt for which he has no security." Harding v. Tifft, 75 N. Y. 461. Where no application has been made by either party, payments will be applied to the oldest indebtedness. Hollister v. Davis, 54 Pa. St. 508. Under these rules, the payments operated to satisfy the earlier deliveries under the contract, and not the later ones. We said in our former opinion that the plaintiff "could not appropriate any moneys received from the fire department, and which, under the contract, were properly applicable to the payment of this claim, to other accounts, and thus prejudice the defendant." But those payments were applied in accordance with the terms of the contract. Possibly it may be claimed that the drafts of the fire department which constituted the payments were for oats delivered subsequently to the guaranty, and hence, in equity, should be applied on account of their purchase price. I have looked in vain through the case for any evidence to support this claim. The only evidence on the subject is that the drafts were "warrants by the city for August and September." There is nothing to show that these warrants were for deliveries made to the fire department in August or September,—much less, that they were for deliveries made by the plaintiff to the firm of Angline Bros. during those months. If the appellant was entitled to have these drafts applied on his liability, the burden rested on him affirmatively to show that they should be so applied. Under the evidence, therefore, the instructions asked for by the appellant were immaterial.

The judgment and order appealed from should be affirmed, with costs. All concur.

---

GIVEN v. PRUDENTIAL INS. CO. OF AMERICA.

(Supreme Court, Appellate Division, Second Department. November 21, 1899.)

NEW TRIAL—NEWLY-DISCOVERED EVIDENCE.

    New trial will be given defendant in an action on a life policy, on affidavits of newly-discovered witnesses that another person was substituted and examined under the name of deceased, though these affidavits are in some respects contradicted, and the affiants are, according to other affiants, not entitled to belief; it being shown with practical certainty that insured's name, signed to the application and medical examination, was not in his handwriting; the answers in the medical examination showing that the person giving them had little information as to insured's family; he therein being described as a healthy, robust person, while insured died of consumption four months after the examination, and a physician testified

that he attended him, during the year of his examination and the previous year, for tuberculosis, and that he gave every evidence of diseased lungs, and the ordinary symptoms found present in consumption.

Appeal from trial term, Kings county.

Action by Margaret C. Given against the Prudential Insurance Company of America. From a judgment on a verdict for plaintiff, and from an order denying a motion for new trial based on the testimony given on the trial and on affidavits showing newly-discovered evidence, defendant appeals. Reversed.

Argued before GOODRICH, P. J., and CULLEN, BARTLETT, HATCH, and WOODWARD, JJ.

Thomas F. Magner, for appellant.
Walter G. Rooney, for respondent.

HATCH, J. This is quite a remarkable case. There can be no reasonable question but that the application for the policy of insurance upon the life of the deceased, and the medical examination in connection with such application, are the application and examination of the same person upon whose life the policy of insurance was issued. No other applications are produced; neither is there any other medical examination established. The identity of Margaret C. Given, the beneficiary named in the policy, is established as being the same person mentioned in the application for insurance. She did not deny, when presented with such application, that her name signed thereto was in her handwriting; and all of the circumstances connected with the application and the medical examination are clearly convincing of the fact that they were the papers used as the basis for the issuance of the policy. It is also an established fact, for all the purposes of practical certainty, that the name of John C. Given appearing upon the application and upon the medical examination is not in the same handwriting as the genuine signature of John Given as it appears upon the exhibits introduced in evidence, while each is evidently written by the same hand. Experts were called to show that the handwriting upon the application and the medical examination and upon the exhibits of the genuine handwriting was not written by one and the same person. For all practical purposes, such testimony was not needed, as such fact is apparent from the most cursory examination. It is also a singular circumstance that in the exhibits of the genuine handwriting of the person insured the name is written "John Given," while upon the application and the medical examination the name signed is "John C. Given." In the testimony given by the mother upon the trial, she speaks of her son as being named "John." No mention is made of any middle name, and it is quite evident that the testimony of the father and other persons, in speaking of the insured, omitted the middle letter in the name, and uniformly spoke of him as "John," except as in the examination conducted by counsel the name "John C. Given" is used, and the witnesses seem to have adopted that as the name, following the line of the question; but when the insured wrote it himself, and when the mother spoke of her son, it was as "John,"—without any middle name. It is so singular a departure for a man, in writ-

ing his name, if he has a middle letter, not to use the same, as to furnish a pertinent circumstance in considering the other question involved in the case. It is an undisputed fact that the residence given in the application is 150 Jamaica avenue, and that was the real place of residence of the insured. The medical examination taken by the physician representing the company was at 460 Belmont avenue, which was given upon the application as his residence, while the testimony of the doctor was that his real residence was stated to be at Amityville, and 460 Belmont avenue as the place of his temporary sojourn. The medical examination shows that the person examined was a healthy, robust person; and, in the description of the family of the insured, scarcely anything in it is correct. He gives the age of his father as 57, as being dead after two months' illness, and the cause of his death unknown. In fact, the father was alive, and testified as a witness upon the trial. He gives his mother's age as 65, while in fact that was not her correct age. He gives the number of his brothers as three, one of whom was living, and two of whom were dead. The age of the living brother he states as being 32. Such was not the age of any of his brothers. Of the two brothers who were dead, he stated that one died at the age of 10, of measles, and the other at the age of 15, by accident, both of which statements are untrue, as no child died at the age of 10, and none died from accident. In fact, the insured had but two brothers, both of whom were living. He states that he had no sisters, whereas in fact he had one living at the time of the trial. It is clearly evident, therefore, that the person who gave these answers had very little information concerning the family of the insured; and, when coupled with the fact that the signatures to these documents are not in the handwriting of the insured, it is almost controlling evidence that a fictitious person was foisted upon the medical examiner. Such examiner stated that he took down the answers to the questions as they were given at the time, and, while his recollection and testimony are largely dependent upon what appears in the papers, yet it is clear that if the mistake were his, and if the answers were not given, then we must say that the physician, without any motive, wrote down false answers and made false statements of facts as given to him upon the examination, and committed perjury upon the trial. He had some independent recollection, as he was able to describe generally the person he examined, and he testified positively that the answers appearing were the answers given to him by the person whom he examined. The application bore date on the 12th day of February, 1897, and the medical examination was had on the 15th of the same month. The insured died on the 25th day of July, 1897. He thus survived the examination 4 months and 10 days. The cause of his death was consumption, and it appeared by the testimony of Dr. Willis, who was called by the defendant, that his father, then deceased, and himself, during his father's illness, attended the insured professionally in 1896 and 1897, and that he was at that time suffering from tuberculosis, and gave every evidence of diseased lungs, and the ordinary symptoms found present in consumption. The physician who attended him just prior to his death, and who gave the death certificate,

recited therein that the insured died of consumption, and that he had suffered from the disease about a year. The physician qualified the latter statement by saying that he obtained his information from casual inquiries, and that the duration of the disease was not based upon any facts within his knowledge. This statement is undisputed by any medical witness, and is in entire harmony with the condition as described as early as 1896, and with the cause of death. Upon this branch of the case the attending physician testified that consumption causing death might be of a recent date, and within a period of three or four months. In rebuttal of this testimony, several witnesses were called, including the father and mother, and other neighbors who knew the insured, and they all testified that prior to the time when the insurance was effected, and subsequent thereto, the insured was in sound bodily health, and, so far as they were able to discover, suffering from no disease; and it was upon this testimony that the court submitted the case to the jury, upon a charge to which no exception was taken, and which in all respects fairly apprised the jury of the questions they were to consider. The motion for a new trial was based upon affidavits of a family who lived at 460 Belmont avenue, and in the room occupied by these persons the examination was held. These affidavits state that one John Tibbo was substituted and examined by the medical examiner under the name of "John C. Given," and that thereafter Tibbo stated that he was to receive pecuniary compensation for his part. These affidavits in some respects are contradicted, and the affiants themselves were shown to be persons of bad character, and not entitled to belief, by other affiants.

It is upon substantially this case that we are called upon to pass, and, as we observed in the beginning, it is quite a remarkable case. The court was undoubtedly justified in submitting the case to the jury; but, in view of the apparent falsification of the signature of Given to the application and the medical examination, a condition was created which required the most careful scrutiny. After the verdict was found, there still remained a case where justice required that the defendant should have the benefit of every circumstance which it might obtain from the lips of any witness which tended to explain and clear up the strong suspicion of fraud which was created by the signatures to the application and the medical examination, and the discrepancies between what appeared in the latter and what was the fact. In view of all the circumstances in the case, we think that justice will be better conserved by sending this case to another jury for trial, wherein the defendant may be able to produce the persons who make the affidavits, where their testimony and appearance may be subject to the scrutiny of the jury. The appellant does not seem to be at fault in not producing this testimony upon the trial, as it had no reason to suppose at that time that the witnesses were possessed of the evidence appearing in their affidavits. As the new trial is ordered in the exercise of discretion, and as a favor to the defendant, it should be conditioned upon the payment of costs, as is customary when the verdict is set aside as being against the weight of evidence.

Landrigan v. Railroad Co., 23 App. Div. 43, 48 N. Y. Supp. 454. The judgment should be reversed, and a new trial granted.

Judgment and order reversed, and new trial granted, upon appellant within 20 days paying trial fee and disbursements of trial. Upon failure to comply with said conditions within the time aforesaid, then judgment and order affirmed, with costs. Appeal from order denying motion for new trial on the ground of newly-discovered evidence dismissed, without costs. All concur.